Lloyd MATTHEWS, Plaintiff, Appellee,

v.

Paul RAKIEY, et al., Superintendent at
MCI–Walpole, Defendant, Appellant.

No. 94–2017.

United States Court of Appeals,
First Circuit.

Heard Feb. 9, 1995.

Decided May 8, 1995.

Linda Nutting Murphy, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., Boston, MA, was on brief, for appellant.

Stephen Hrones, Boston, MA, orally, Lloyd Matthews, on brief pro se for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Petitioner Lloyd Matthews was convicted in August 1987 in a Massachusetts trial court of rape, assault in a dwelling with intent to commit a felony, and indecent assault and battery. After exhausting his remedies in the state courts, Matthews sought a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254, claiming that he was denied his Sixth Amendment right to effective assistance of counsel. After referring the matter to a magistrate-judge for a report and recommendation, the district court granted the petition, and this appeal followed. For the reasons discussed below, we reverse.

## I.

### BACKGROUND

#### A. Pretrial Events

On May 15, 1986, Brenda Barbosa, who was fourteen years old at the time, reported to Boston police that she had been attacked in her bedroom by a man with a knife earlier that morning. Later that same day, after viewing several hundred photographs in police identification books, Barbosa identified Matthews, who wears his hair in a distinctive "dreadlocks" style and was so depicted in the photograph, as the man who had attacked her. The police obtained an arrest warrant but, although they knew Matthews's address, made no immediate attempt to question him about the incident or take him into custody. Matthews was eventually arrested on May 28, 1986, when a patrolling officer who had stopped to question Matthews on the street about unrelated conduct discovered the outstanding warrant.

The incident report filed by the Boston police officer who first responded to Barbosa's call (the "incident report") contains no mention of a sexual assault. The officer's account of his interview with Barbosa, conducted within two hours of the incident, is as follows:

[T]he victim ... stated while she was sleeping the suspect entered the victim's bedroom and jumped on top of her. The victim stated the suspect had a kitchen knife and told her, "Be quiet, I don't want nothing from you, you won't get hurt." The victim further stated the suspect then pulled the victim from her bed and ordered the victim to stand in a corner then the

suspect ordered the victim to stand against a wall. The victim then stated the suspect started looking through the rooms on all three floors. The victim further stated the suspect then told the victim to close the door behind him when he left and not to tell anyone about him. The victim stated she complied and the suspect fled on foot to a yellow m/v then fled in an unknown direction.

The incident report includes a description of the alleged assailant as a black male, 5′10″, black hair and brown eyes, wearing a black hat, brown leather jacket and black pants. It does not indicate whether Barbosa mentioned to the officer that her attacker had dreadlocks.

Matthews was initially charged with armed assault in a dwelling with intent to commit a felony, and with breaking and entering. A probable cause hearing was conducted in Roxbury District Court on August 4, 1986. There is no transcript of the hearing in the record. Although the breaking and entering charge was dropped following the hearing, Matthews was bound over on the armed assault charge. Subsequently, grand jury proceedings were initiated on that charge as well as two new charges apparently based on Barbosa's testimony at the probable cause hearing: rape of a child with force, and indecent assault and battery on a person under 14. At the grand jury proceeding, Boston Police Detective William Ingersoll—who oversaw the photo identification procedure in which Barbosa picked out Matthews—testified as follows:

A. ... At the probable cause hearing in the Roxbury Court I was not present ... and I received a message following that hearing from the District Attorney who stated to me that during the probable cause hearing the victim—who was afraid to tell her mother and the police—that at the time during this breaking and entering and assault, the defendant did assault this young girl, again, 14 years of age.

Q. In what manner?

A. I believe it was placing the fingers to her vagina, more or less just the fingers. She did not go to the hospital to be exam-ined. Again, she is a young Spanish girl and was ashamed even to tell the mother.

There was no complaints at that time for rape in the Roxbury District Court against him. I was unaware of this fact.

Barbosa also testified before the grand jury. Certain aspects of her account of the May 15 events were not entirely consistent with the second-hand version contained in the incident report:

A. Well, I was sleeping and I heard the bedroom door, and when I looked up I seen this man and he jumped on top of me and put me against the wall....

....

Q. Did he take anything?

A. The only thing I found missing was my leather coat, and stuff was in the first floor.

Q. Do you know whether he took that coat?

A. I don't really know, but he must have took it because I couldn't find it; I looked for it; I asked my sister if she let someone use it; she said, no.

....

Q. Now, when this man jumped on you, did he touch you in any way?

A. Yes.

Q. And what part of your body did he touch?

A. He touched me, all parts.

Q. You[r] chest and your vaginal area?

A. Yes, sir.

Q. Did he put his fingers into your vagina at some time?

A. Yes.

Q. When the police came that day, did you tell the police that day?

A. I told them everything that happened, like in a way I was—when I went to the police station to look at the pictures I told them what happened.

### B. The Trial

On August 17, 1987, Matthews was brought to trial on the rape, armed assault and indecent assault charges. The prosecution called two witnesses, Barbosa and Inger-

soll, with Matthews as the only defense witness. Because we must evaluate the alleged constitutional deficiencies of counsel's performance in light of his "overall performance throughout the case," *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), we provide an extensive summary of the trial record.

### 1. Opening Statements

In his opening statement, the prosecutor told the jury that immediately after Barbosa's attacker left her apartment, Barbosa ran next door "and told her sister-in-law what had happened." Despite strong evidence that Barbosa never told anyone that she had been sexually assaulted or raped until she testified at Matthews's probable cause hearing, 81 days after the incident, Matthews's trial counsel, Kenneth D'Arcy, did not challenge the prosecutor's assertions. D'Arcy made clear from the outset that instead of challenging Barbosa's allegations, he would try to show that she had mistakenly picked Matthews out of the police photograph books because of his distinctive "dreadlocks" hairstyle. D'Arcy told the jury that "[t]here's no question in my mind and Mr. Matthews' mind that Brenda Barbosa was attacked in her bedroom on May 15th. But you're going to hear from Mr. Matthews that on May 15th he was working in his father's garage."

### 2. Barbosa's Testimony

Barbosa, who had reached sixteen years of age by the time of the trial, testified on direct examination that she was asleep in her bed about 8:30 a.m. on May 15, 1986, when she was awakened by a man entering her room. When she looked up, she saw the man had a knife. The man got on top of her, put the knife to her throat and told her to be quiet or he would kill her. The man touched Barbosa's breasts and put his finger inside Barbosa's vagina. Then, the man pulled Barbosa off the bed and placed her against a wall, telling her to stay there while he walked through other rooms of the house. Barbosa said he took her leather coat, although she did not say whether she saw him carry the coat away. Barbosa identified Matthews as the man who attacked her. The following exchange then ensued:

Q. You went to your sister-in-law's; did you tell her what happened?

A. Yes.

Q. Did you call the police?

A. Yes, I did.

Q. You reported this to the police, didn't you?

A. Yes.

Q. Now, at some point during the day did you have an opportunity to meet with Detective Ingersoll of the Boston Police?

A. Yes, I did.

Q. Did you go over what happened with him? Did you tell him about that?

A. Yes, I did.

Barbosa then testified as to how she picked Matthews's photograph out of the police books. She said that she got a good look at her attacker's face; that her attacker had long hair pinned up under a gray beret-like hat; and that she had described the man to police as being about five-foot-eleven with dreadlocks and a hat. Barbosa also testified that a few days after the attack, the same man came to her door and rang the doorbell. She said that she "went crazy, and ... started crying, and he just left."

In his cross-examination, D'Arcy quickly began his attempt to show that Barbosa had immediately zeroed in on the fact that the assailant had dreadlocks:

Q. This man came in, and what's the first thing you remember about his physical appearance when you saw him in your bedroom?

A. I don't really understand what you mean.

Q. What was the first physical characteristic that you saw in this man when you saw him in the bedroom and he woke you up and you were afraid; what's the first thing you recognized about him?

A. The knife.

Q. And then what about a physical characteristic? After you saw the knife, and you saw this man with the knife, what physical characteristic did you remember?

A. I still don't understand what you mean.

Q. When you describe people—

A. Yes.

Q. —you describe people as short—

A. Oh, you want me to describe him, like when he first came in?

Q. Yes, when you first saw this man and you saw the knife, and you got over the shock of the knife, and you saw that this man was in your bedroom and he didn't belong there—

A. Yes.

Q. —what physical characteristic of this man did you first remember—first remember?

A. The way he looked, his face, and the way he was like coming towards me.

Q. What about his hair style?

A. I recognized that too.

Q. The dreadlocks?

A. Yes.

D'Arcy then questioned Barbosa about her identification of Matthews as her attacker. He elicited the not-too-helpful testimony that she had seen other people with dreadlocks before encountering Matthews, but that they did not look like him; that she identified Matthews the same day as the alleged attack; that she "could never forget his face"; and that she had picked the picture out after viewing it for just half a second. Before he concluded this line of questioning, D'Arcy inartfully allowed Barbosa one more opportunity to tell the jury how certain she was of her identification of Matthews:

Q. There's no question in your mind that this is the man that broke into your house and had a knife in his hand?

A. That's the man.

At that point, D'Arcy changed the focus of his examination and began to question Barbosa's account of what had happened and her veracity:

Q. Then did you tell Detective Ingersoll at that time, you know, that he touched your private parts at all?

A. I told him what had happened.

Q. Well, did you tell him, you know, as you told the jury today, that the man grabbed your private parts?

A. I only told him what he was asking me.

Q. Is it fair to say, Brenda, that you really didn't tell Detective Ingersoll everything that happened when you were going over the pictures?

A. I told him most everything that happened.

Q. But you didn't tell him about the fact that this man touched your private parts?

A. No, but I told the other cops when they came.

Q. When?

A. When it first happened, the cops that came over to the house. It's right in the report.

Q. You told them that he had grabbed you?

A. Yes.

Q. And touched your private parts, right?

A. Yes.

Although these last four answers were apparently untrue, D'Arcy did not directly confront Barbosa with any prior statements or other evidence contradicting her testimony.

### 3. Ingersoll's Testimony

Ingersoll testified that Barbosa and her sister-in-law, Carmen Barbosa, came to his office on the afternoon of May 15 to view photographs. Ingersoll said he "tried to determine what exactly had happened" and then began showing Barbosa books containing photographs of black men of the approximate age that Barbosa had described. Ingersoll testified that, in his estimation, Barbosa viewed "about 600, 700 photographs." When she turned to the photograph of Matthews, Ingersoll said, Barbosa "became very excited. 'That's him.' She got up from the table, jumping up and down. 'That's him, that's him.'" Ingersoll said that the picture of Matthews matched the general description contained in the original incident report, and that during her conversation with Ingersoll prior to viewing the photographs, Barbosa had mentioned that the attacker had dreadlocks.

On cross-examination, D'Arcy resumed his strategy of trying to show that Barbosa had picked out Matthews's picture because of his dreadlocks:

Q. Now, when Brenda Barbosa came in the station, she gave you a description of the man that was in her home earlier, had dreadlocks; do you remember?

A. That's correct.

Q. You don't have any books or just males with dreadlocks, though; right?

A. No, sir. The space just doesn't allow it.

. . . .

Q. Did you look at any of the photos that she looked at, looking for men with dreadlocks?

A. Not at that particular time, no, sir. I basically put a lot of the photographs in the books when we receive them for identification. I don't make a special notice of dreadlocks.

Q. Do you know how many men had dreadlocks in the photos before Miss Barbosa picked Lloyd Matthews' picture?

A. I have no idea.

Q. It could have been any of them?

A. It could have been any, could have been a few, could have been one. I don't know.

Q. Could have been one, right?

A. The books are set up, Mr. D'Arcy, only by age, sex and race; that's it.

Q. So you're testifying today that Mr. Matthews could have been the first male that had dreadlocks in those photo books; correct, Detective?

A. Could have been.

Upon further questioning by D'Arcy, Ingersoll testified that he "kn[e]w for a fact that there are many dreadlocks" in the photograph books, and that he had "had every confidence in the world that she would run into dreadlocks." He also testified that he did not personally arrest Matthews, nor did he immediately have police officers go to Matthews's home to arrest him once an ar-rest warrant issued. Instead, Ingersoll said, he told another police officer with duty in Matthews's neighborhood of the warrant, and that officer told Ingersoll "that he would lock him up when he sees him." Matthews was ultimately arrested when police stopped to question him on a Roxbury street on May 28, nine days after the warrant had issued and thirteen days after the crimes allegedly took place.

### 4. The Defense

After the prosecution rested, D'Arcy notified the court that Matthews was "very upset" with D'Arcy for not wanting to recall Barbosa to the stand to question her about discrepancies between her trial testimony and prior statements. D'Arcy told the court:

But in my perusal of the grand jury minutes, I mean—you know, this is an identity type of case, your Honor. I know what the girl has been through. It's obvious that a crime was committed. My client's defense is that it's a misidentity. She testified there was no question in her mind it was him.

Whether she came downstairs with him or looked out the window, there's sort of minor discrepancies as far as I'm concerned.

It's a disadvantage when you try to examine young ladies because of the fact that she's highly emotional. I just feel—I disagree with my client. I told him I didn't want to recall Brenda Barbosa. You know, the bottom line is that I'm trying the case and he isn't.

But I just want the record to reflect that, you know, he's been more than vociferous that he doesn't agree with my strategy, shall we say.

D'Arcy then called Matthews to the stand. Matthews testified that he had worked at his "father" John Wornum's [1] auto body shop in Roxbury on and off for years. From April until July of 1986, Matthews testified, he and a friend, Chris Cross, were rebuilding a junked car that they eventually sold to a friend of Wornum. Matthews could not say

---

1. Wornum explained in a post-trial affidavit that he is a long-time friend of Matthews's family and that Matthews would sometimes call him his "uncle" or "father" even though the two are not related.

specifically that he was working at the shop on the morning of May 15, 1986, but he said that it was his usual practice to open up the shop each morning at 7:30 a.m.

On cross-examination, Matthews explained that he was paid in cash and had no records or pay stubs proving that he worked at the body shop. John Wornum, Matthews testified, had been in Georgia for several months; Wornum's son, Rufus Wornum, was busy running the shop, and Chris Cross had agreed to testify on his behalf but had since joined the Marines. Matthews also testified that he had no records pertaining to the rebuilt car, and that he did not know the person who bought it other than that he was a friend of John Wornum. The prosecutor's final exchange with Matthews was as follows:

Q. You're not specifically testifying as to where you were on the morning of May 15th, 1986; are you?

A. No, sir.

### 5. Closing Arguments

Unlike his opening, D'Arcy's summation contained at least some hints to the jury that perhaps Barbosa's story of what happened to her was not entirely truthful. After incorrectly telling the jury that they had "seen a girl fourteen years old," D'Arcy urged the jurors not to let their emotions affect their deliberations about

what happened to this girl, if in fact it did happen. . . .

. . . .

You have to decide did Brenda Barbosa really tell the truth of everything that happened. Did she wake up and see a fellow there with a knife? Was it somebody maybe she—she didn't go to school that day—that maybe a fellow that she was going to go to school with—maybe something got carried on that she didn't expect and she panicked, because she lived right—a relative lived right around the corner.

Did it happen to her? Did she tell Officer Ingersoll that she had been sexually assaulted?

D'Arcy did not, however, point to any evidence or prior statements suggesting that Barbosa was not truthful. Instead, he discussed at length how a "hysterical" Barbosa had zeroed in on Matthews's photograph "[a]s soon as she saw the dreadlocks," and how the failure of the police to arrest Matthews as soon as Barbosa had identified him was not "fair play." The near-two-week delay in Matthews's arrest left Matthews virtually no chance to prove that he was at the body shop while Barbosa allegedly was attacked, D'Arcy argued.

Toward the end of his argument, D'Arcy again suggested that this was not just a case of mistaken identity, but also of truthfulness:

Did you hear any hospital testimony regarding any physical disability with Brenda Barbosa? Because I suggest she didn't tell anybody the day she picked out Mr. Matthews' picture.

Did you hear any evidence of a lock being broken or of any damage to her house that allowed this stranger to come in? No.

And again:

Ladies and gentlemen, I suggest that all of these gaps create some doubt, and that's the magic word, "doubt", beyond a reasonable doubt. That's what you have to be convinced, that Lloyd Matthews was the individual that came into a room, and if in fact there was a breaking and entering, and indecently assaulted Brenda Barbosa, if in fact she was, and stuck his finger in her vagina, if in fact that was done.

Because I suggest a fourteen year old that this has really happened to, when she went running out to her relation, she would have said, "I've been violated," and she would have been brought right to the hospital for examination.

You know, fourteen years old, if this is what happened. Then from the hospital the police would have got up there, and then maybe if she had told all the truth right away they would have picked up or investigated Lloyd Matthews that day.

Had that occurred, D'Arcy argued, Matthews could have proved where he was the morning of May 15 and refuted the notion that *he* was the dreadlocked man who had attacked Barbosa.

The prosecutor recounted how certain Barbosa was of her identification and the substantial opportunity she had had to see him when he entered her room and was on top of her. He told the jury to consider "the sincerity of her emotions" in testifying:

> Keep that picture of her in your mind. Those were not crocodile tears that came out of her eyes. Those were genuine tears based on honesty and certainty.

> Brenda Barbosa came to this court to seek justice, and you can give her justice. She is the victim.

In contrast to Barbosa's sincerity, the prosecutor pointed to the "vague" nature of Matthews's testimony: "That he worked at a vague garage, working on a vague Lincoln, making vague repairs. Nothing to back it up." In the end, the prosecutor said, the issue for the jury was one of credibility: "You have to make a determination of who to believe; who was honest; who was sincere; who was certain; and who was vague."

The jury deliberated for about four-and-one-half hours before returning verdicts of guilty on all three counts. Matthews was sentenced to concurrent state prison terms of 12 to 20 years, 10 to 15 years, and 4 to 5 years.

### C. Post–Conviction Proceedings

Matthews moved for a new trial on a number of grounds, including ineffective assistance of counsel and newly discovered evidence—namely, an affidavit from John Wornum to the effect that he would corroborate Matthews's testimony that in May 1986, he normally opened the body shop at 7:30 in the morning, and that on May 15, 1986, Matthews "would have been working" at the shop when Barbosa was allegedly attacked. The trial court denied the motion. The Massachusetts Appeals Court affirmed the conviction, and the Supreme Judicial Court denied Matthews's petition to obtain further appellate review.

Having exhausted his state remedies, Matthews filed his petition for habeas corpus in the district court on August 30, 1990. Matthews argued that D'Arcy committed numerous errors that deprived him of effective assistance of counsel: 1) failure to impeach Brenda Barbosa with her prior inconsistent statements; 2) failure to make an effective closing argument; 3) failure to have Matthews's only alibi witness, John Wornum, appear and testify at trial; and 4) failure to prepare adequately for trial and to object to improper leading questions and to the prosecutor's closing argument. The respondent argued that D'Arcy's alleged "errors" were tactical or strategic choices made so as not to undermine D'Arcy's strategy of pursuing the "dreadlocks" defense.

An evidentiary hearing was convened on January 15, 1993, but neither party chose to present evidence beyond that already contained in the record. On March 17, 1993, a United States Magistrate Judge agreed with virtually all of Matthews's assertions and, finding that "the culmination of errors taken as a whole ... establishes trial counsel's ineffective assistance in this case," recommended that the writ be allowed.

The district court adopted the magistrate-judge's recommended result but not her reasoning. The court found that D'Arcy had adopted a professionally responsible strategy by not contesting that Barbosa was sexually assaulted by a black man with dreadlocks and by seeking instead to suggest that, in her subsequent hysteria, she mistakenly selected Matthews's photograph because his was the first picture of a man with dreadlocks. The court held that because D'Arcy relied on the mistaken-identity defense, however, his failure to investigate Matthews's only alibi witness, John Wornum, or to seek a continuance in order to do so, was not ascribable to any strategic reason and therefore constituted constitutionally deficient assistance of counsel that prejudiced Matthews.

The respondent appealed, arguing that Wornum's affidavit contained no indication that his testimony would provide an alibi for Matthews. Matthews filed two briefs pro se, one as appellee urging that we affirm the district court's order, and another as appellant asking that we grant the petition on the grounds recommended by the magistrate-judge but rejected by the district court.

## II.

### DISCUSSION

#### A. Governing Principles

■ To establish a Sixth Amendment violation of the right to effective assistance of counsel, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that prejudice resulted. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Scarpa v. Dubois,* 38 F.3d 1, 8 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995). Among the basic duties of an attorney is "to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

■ In evaluating the reasonableness of an attorney's performance, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). We must make "every effort ... to eliminate the distorting effects of hindsight" and to evaluate counsel's conduct from his or her perspective under the circumstances as they existed at that time. *Id.*

■ We say that a defendant was prejudiced by his lawyer's substandard performance if he can show that, but for counsel's errors, "there is a reasonable probability ... that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [2] *Id.* at 694, 104 S.Ct. at 2068. *See also Scarpa,* 38 F.3d at 8. "In making this determination, a court ... must consider the totality of the evidence before

the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. As "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," *id.* at 698, 104 S.Ct. at 2070, we review these issues *de novo. Scarpa,* 38 F.3d at 9.

#### B. D'Arcy's Performance

Matthews concedes that the central issue in the case was the identity of the attacker. What he challenges is D'Arcy's decision to use the "dreadlocks" defense to attempt to persuade the jury that Barbosa had misidentified Matthews, rather than focusing on the apparent inconsistencies of her prior statements and her failure to report the alleged rape immediately. D'Arcy's decision to employ the dreadlocks strategy was not a professionally reasonable choice, Matthews claims, because D'Arcy possessed no evidence that Barbosa had picked Matthews's photograph out because of his hairstyle. D'Arcy had no knowledge of how many pictures of men with dreadlocks Barbosa had seen before identifying Matthews, and the police report contains no indication that Barbosa had mentioned dreadlocks in her initial description of the attacker, thus undermining the argument that the hairstyle was the predominant feature. Therefore, Matthews argues, instead of concealing the fact that Barbosa did not mention dreadlocks initially, D'Arcy should have driven this point home to the jury and called into question Barbosa's powers of observation. Furthermore, Matthews maintains, D'Arcy should have questioned Barbosa about the discrepancy between the police report's version of when she initially saw her attacker, and her own testimony—i.e., whether she was awakened by a man entering her bedroom and jumping on top of her, or whether she heard the door, and thus had a longer time to view her attacker—and he should have called into question Barbosa's truthfulness generally by impeaching her regarding her delay in re-

---

**2.** Counsel for the respondent, an assistant attorney general for the Commonwealth of Massachusetts, dropped the "reasonable probability" language from this standard and misleadingly suggested to us that *Strickland* requires the defendant to prove that "but for" counsel's inadequa-

cies, the verdict would have been different. *Brief for the Respondent/Appellant* at 9. *Strickland* expressly rejected a more-likely-than-not outcome-determinative standard. 466 U.S. at 693, 104 S.Ct. at 2067.

porting the alleged rape. Finally, Matthews argues, D'Arcy should have marshalled an effective closing argument underscoring the inconsistencies in Barbosa's prior statements, rather than delivering a disjointed speech that, Matthews claims, bordered on an invitation to convict.

 We disagree that D'Arcy's strategic choice to employ the "dreadlocks defense" was professionally unreasonable. That it was not ultimately a winning strategy is of no moment in assessing its reasonableness at the time, see *United States v. Natanel*, 938 F.2d 302, 310 (1st Cir.1991), *cert. denied*, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). D'Arcy had little to work with, given the persuasive power of Barbosa's identification testimony and the inherent weakness of Matthews's alibi, and he chose what he thought was a reasonable line of argument that carried with it little risk of alienating the jury. A strategic choice that would have included more direct attacks on Barbosa's credibility and, inevitably, her character, would have carried with it a far greater risk of offending the jury. Thus, we hold that, in choosing to emphasize Matthews's dreadlocks as the reason that Barbosa identified him as her attacker, rather than highlighting alleged inconsistencies in Barbosa's trial testimony and her prior statements, D'Arcy employed a professionally reasonable strategy and did not, by virtue of that choice alone, deprive Matthews of effective assistance of counsel.

 Matthews also argues, however, that D'Arcy did in fact challenge Barbosa's credibility—by questioning her about her apparent failure to report immediately that she was raped, and by arguing this point to the jury—and that therefore D'Arcy's failure to impeach Barbosa more directly, or at least to introduce the impeaching evidence through another witness, cannot be deemed a strategic choice. We agree that the record makes clear that D'Arcy did attempt to elicit from Barbosa an admission that she did not immediately report the rape. Indeed, D'Arcy successfully forced Barbosa to change her testimony and admit that she had not, in fact, told Detective Ingersoll about the rape. The question we must address, however, is

whether, once Barbosa went on to testify that she had told the police who had initially responded to her call that she was raped, and that "it's right in the report," D'Arcy's failure to demonstrate to the jury that these statements were apparently untrue constitutes ineffective assistance of counsel. Put another way, the issue is whether it may be considered acceptable trial strategy to have questioned Barbosa about her delay in reporting the rape without impeaching her when the answers she gave were not favorable to Matthews.

Bearing in mind that the defendant must overcome "a strong presumption" that D'Arcy's conduct "falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, we are unable to come to any conclusion other than that Matthews has not done so here. To be sure, there were points to be scored against Barbosa's credibility after she insisted that she had in fact immediately told police that she had been raped. D'Arcy could have confronted her with the incident report containing no mention of a rape, or he could have asked her about her testimony at the probable cause hearing. He also could have questioned Ingersoll about when he first learned that Barbosa claimed to have been raped. But, as D'Arcy made clear to the trial judge at a sidebar conference following the close of the prosecution's case, Matthews's *primary* defense remained that Barbosa had picked out the *wrong* assailant, and not that she had not been attacked at all. While Barbosa's delay in reporting that she was raped *might* have affected the jury's assessment of her overall credibility as a witness, we think this would be much more likely if the primary issue had been consent. Here, the primary issue, and the heart of the defense's theory, was not *whether* a crime occurred but rather who committed it. Moreover, the record makes apparent that Barbosa was quite obviously upset on the witness stand as she retold her experience; this circumstance, along with Barbosa's youth (rendering her failure to report a rape immediately all the more explicable), diminishes the likelihood that the jury would doubt that such an attack occurred simply because

Barbosa delayed in reporting it. D'Arcy had to balance the limited evidentiary value of Barbosa's delay against the danger of the jury misperceiving an impeachment attempt as badgering or callously tarnishing Barbosa. Another lawyer might have struck a different balance, but we do not find that D'Arcy's on-the-spot decision to let Barbosa's answer stand and argue the inference he had raised to the jury was "beyond the wide range of reasonable professional assistance."[3]

■ The other alleged inconsistencies in Barbosa's statements that Matthews claims D'Arcy should have raised are trivial, and thus D'Arcy's decision not to question Barbosa about them was a sound tactical choice. That the incident report, prepared immediately after the attack, contains no mention of dreadlocks, is inconsequential in light of the fact that Barbosa told Ingersoll before viewing any photographs that her attacker had dreadlocks. Furthermore, to point out this "inconsistency" would have only weakened D'Arcy's argument that it was the dreadlocks that had in fact caused Barbosa to pick Matthews's picture out of the photograph books. As for the "inconsistency" between when Barbosa initially told police she was awakened and her testimony in court, we note that the incident report's statement that "while [Barbosa] was sleeping the suspect entered the victim's bedroom and jumped on top of her" is a *hearsay* account of what Barbosa said immediately after the attack, and, even if true, would only have deprived her of a few seconds of the time she claimed to have viewed her attacker. She still was able to view him while he was on top of her; at various times while he searched the apartment; and when he returned to Barbosa's home on the weekend. Thus, D'Arcy's decision to eschew questioning on these matters was a sound trial tactic.

■ Finally, we address the grounds on which the district court actually granted the writ: D'Arcy's failure to call John Wornum, or to request a continuance so that he could do so. Here, we disagree with the district court's conclusion; we cannot see how Matthews was prejudiced. Wornum's testimony would have corroborated Matthews's testimony in general—i.e., that there actually was a Crossing Auto Body Shop, and that Matthews actually worked there, and perhaps even that he generally opened the shop early in the morning—which would have taken some of the wind out of the sails of the prosecutor's closing argument, in which he cast doubt on the entirety of Matthews's testimony. Wornum's affidavit makes clear, however, that he could *not* provide an alibi for Matthews on the particular day of the crime. Matthews argues that Wornum's testimony is all the more credible because he does not pretend to be able to say for sure where Matthews was on a particular morning several years ago. That *may* be true, but it is far less probative of Matthews's innocence. Moreover, a jury might have drawn a nega-

---

3. Our dissenting brother conveniently overlooks that part of Barbosa's identification testimony in which she claimed that Matthews made a second trip to her home, only to be dissuaded from entering by her frightened response to his appearance at her door. Given the strength of her identification of him as her assailant, it was essential that counsel try to deflate this aspect of Barbosa's testimony. Moreover, it is a misstatement to say that there was "irrefutable evidence" that Barbosa failed to report the rape for an eighty-one day period. While the initial police record does not indicate that a rape was part of the physical attack, and Ingersoll's grand jury testimony was that *his* first knowledge of that part of the attack came as a result of the probable cause hearing, there is nothing in the record stating unequivocally that Barbosa had not told other authorities of the alleged rape prior to the probable cause hearing.

Finally, we respond to our brother's assertion that we give "too much credence to certain ageist and sexist assumptions—that it would be improper to question closely (and risk arousing the emotions of) a young female sexual assault victim...." First, our assessment of the reasonableness of D'Arcy's strategy would be no different had the victim been a fourteen-year-old boy. Second, lawyers must devise their strategies in light of how *real* jurors might react—not necessarily politically correct ones. The dissent suggests that a lawyer who considers the unfashionable assumptions and reactions of jurors in crafting a strategy deserves less deference than does a lawyer who ignores them or decides that the jury will rise above them. We disagree. We do not dispute that D'Arcy *could* reasonably have chosen a strategy involving more aggressive and complete impeachment; *not* doing so, in this case, was also within the "wide range" of reasonable professional choices recognized by the *Strickland* Court.

tive inference from the things that Wornum's affidavit does *not* indicate he is willing to testify to: namely, the identity of the purchaser of the car Matthews says he was rebuilding around the time of the crime, or any other information regarding the car's purchase and sale. Thus, while Wornum's testimony might have been, on balance, of marginal utility to Matthews, his affidavit does not create in us any belief that there is a reasonable probability that the outcome would have been different had he testified.[4]

### III.

### CONCLUSION

For the foregoing reasons, we conclude that Matthews was not deprived of his Sixth Amendment right to effective assistance of counsel, and the decision of the district court is

*Reversed.*

BOWNES, Senior Circuit Judge, dissenting.

I agree with the majority that D'Arcy's failure to call John Wornum, when examined in isolation, did not violate the Sixth Amendment. I strongly disagree, however, that the complained of acts and decisions of D'Arcy, when viewed in the aggregate, "f[ell] within the wide range of reasonable professional assistance" and constituted "sound trial strategy." *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Furthermore, I am convinced that, but for D'Arcy's unsound performance, "there is a reasonable probability that the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. I therefore dissent from the majority opinion. In explaining my dissent, I shall limit myself to three points not made in the extremely thorough and well-reasoned report and recommendation of Magistrate Judge Bowler, the relevant portion of which I attach as an appendix to my dissent. *See Matthews v. Rakiey,* Civil Action No. 90–12111–WF (D.Mass. filed March 17, 1993). Magistrate

Judge Bowler's opinion combines an accurate exposition of the facts with a correct statement of the applicable legal principles.

### I.

The majority opinion makes clear that D'Arcy declined to submit irrefutable evidence, readily available to him, that Barbosa waited eighty-one days to report the rape and that Barbosa testified untruthfully as to when she first informed the police and her sister-in-law that she had been raped. In considering whether D'Arcy's inaction was substandard under *Strickland*'s first prong, the majority employs a false assumption. The majority excuses D'Arcy's tactics in part by pointing out that he pursued a misidentification defense (the "dreadlocks defense") and did not really challenge Barbosa's rape allegation. *See ante* at 917 ("Matthew's primary defense remained that Barbosa had picked out the *wrong* assailant, and not that she had not been attacked at all. While Barbosa's delay in reporting that she was raped *might* have affected the jury's assessment of her overall credibility as a witness, we think this would be much more likely if the primary issue had been consent. Here, the primary issue, and the heart of the defense's theory, was not *whether* a crime occurred but rather who committed it."). It then concludes that, in the context of the misidentification/dreadlocks defense, D'Arcy's failure to expose the glaring inconsistencies in Barbosa's testimony and prior statements was not "beyond the wide range of reasonable professional assistance." *Id.* at 917–18.

Obviously, this line of reasoning tacitly assumes the soundness of D'Arcy's decision not to question whether Barbosa had in fact been raped. Such an assumption is not warranted in this case for the following reasons. First, the two defenses would not have been inconsistent. There would have been nothing inherently suspect about arguing that Barbosa had identified the wrong man *and* that she had not been, or may not have been,

---

4. We have also considered Matthews's claims that he was deprived of effective assistance of counsel by D'Arcy's "incoherent" closing argument, his lack of preparation and his overall performance throughout the course of the trial. Even if Matthews is correct that D'Arcy's performance in these areas was deficient, Matthews has not demonstrated, and the record does not lead us to believe, that the was a reasonable probability of a different outcome if D'Arcy had performed differently.

raped. Second, there was significant evidence tending to undermine Barbosa's account of the sexual assault. Had the jury been fully apprised of the irregularities surrounding the reporting of the rape charge, it may well have concluded that it could not convict Matthews of rape beyond a reasonable doubt. Third, D'Arcy *did* argue to the jury, albeit as an afterthought, that Barbosa may not have been raped. *See id.* at 914 (excerpting portions of closing argument where D'Arcy asks the jury to consider whether a rape took place). In view of this last fact alone, I am puzzled by the majority's conclusion that D'Arcy's refusal to buttress his argument with significant supporting evidence constituted "sound trial tactics." D'Arcy ultimately thought the "rape may not have happened" theory worth arguing; how then could it not have been worth supporting with evidence that was available?

I do not think that the existence of one reasonable defense strategy, without more, establishes constitutionally effective representation.

## II.

I also disagree with the majority's conclusion that, within the confines of the misidentification/dreadlock defense, D'Arcy's failure to impeach Barbosa passed constitutional muster. The case hinged on Barbosa's credibility as a witness, and I simply do not see how it could have been "sound" for D'Arcy to fail to demonstrate to the jury that Barbosa had testified untruthfully on several very important matters (including when she first informed the police and her sister-in-law that she had been raped). He certainly could have done so sensitively and without suggesting improper motive on Barbosa's part. The omitted impeachment evidence could have been easily introduced as further confirmation of that which D'Arcy had already suggested to the jury: the trauma of awakening to find an intruder in the room quite reasonably rendered suspect Barbosa's powers of perception and recall.

This leads to a second point. The majority, in my opinion, gives too much credence to certain ageist and sexist assumptions—that it would be improper to question closely (and risk arousing the emotions of) a young female sexual assault victim, and that the jury cannot rise above its sympathy for young female sexual assault victims and do its assigned job—that heavily informed D'Arcy's performance and decision-making. Along these lines, I note the majority's conclusion that Barbosa's age "render[s] her failure to report the rape immediately all the more explicable." *Id.* at 917. The explicability *vel non* of Barbosa's failure to report the rape immediately—as well as Barbosa's failure to testify truthfully about when she first reported the rape—had vital bearing on Barbosa's credibility. It should have been left to the jury's consideration after argument by counsel. In my opinion, a reviewing court has no business explaining this failure away, without citation to supporting authority, as an understandable by-product of youth.

While counsel must tread carefully in questioning the alleged victim in cases such as this, counsel cannot abdicate the constitutional responsibilities of a defense attorney. The record amply demonstrates that D'Arcy was more concerned with the young victim's emotional state than providing his client with a vigorous defense, and that his hands-off approach to the case led to a constitutionally-defective performance. The sentiments that prompted D'Arcy's ineffectiveness may be understandable. They cannot, however, be tolerated in our criminal justice system.

## III.

The majority opinion does not discuss D'Arcy's failure to object to the prosecutor's closing argument, and Magistrate Judge Bowler evaluates this failure only insofar as the argument mischaracterized the evidence. I think it important to note that the closing contained both an improper appeal to the jury to act other than as a dispassionate arbiter of the facts and an improper and inflammatory appeal to the jury's emotions. Neither type of argument is permissible. *See, e.g., United States v. Manning,* 23 F.3d 570, 573 (1st Cir.1994) (prosecutor may not ask jury to act other than as a dispassionate arbiter of the facts); *Arrieta–Agressot v. United States,* 3 F.3d 525, 527 (1st Cir.1993) (prosecutor may not inflame the prejudices and passions of the jury).

Here, the prosecutor told the jury: "Keep that picture of [Barbosa] in your mind. Those were not crocodile tears that came out

of her eyes. Those were genuine tears based on honesty and certainty. Brenda Barbosa came to this court to seek justice, and you can give her justice. She is the victim." *See ante* at 915. Perhaps because the concept of "tears of certainty" is new to me, I regard the first three sentences of the quotation as an ill-concealed and inflammatory entreaty for jury sympathy. And the last two sentences of the quotation are at worst an appeal for vengeance and at best a request that the jury do something other than dispassionately judge the facts for itself.

In a case as close as this one, these improper arguments could have made a real difference. D'Arcy's failure to object to them was another error in the long line of trial mistakes that show his incompetency beyond cavil.

## APPENDIX

United States District Court
District of Massachusetts

LLOYD MATTHEWS, Petitioner,[5]

v.

PAUL RAKIEY, Superintendent at
M.C.I.–Walpole, Respondent.

Civil Action No. 90–12111–WF.

REPORT AND RECOMMENDATION
RE: PETITIONER'S WRIT OF
HABEAS CORPUS
(DOCKET ENTRY # 23)

March 17, 1993.

BOWLER, United States Magistrate Judge.

\* \* \* \* \* \*

5. Petitioner was born in Trinidad, West Indies, and had lived in the Boston area for a period of 13 years. (Tr. 2–64).

6. Arguments are highlighted in the footnotes.

7. In contrast to her court testimony, the Boston Police Incident Report issued on May 15, 1986, 10:25 a.m., states that the victim told the reporting officer that *"while she was sleeping* the suspect entered the victim's bedroom and jumped on top of her." (Docket Entry # 15, Ex. A). (Emphasis added). As elaborated *infra*, petitioner contends that trial counsel failed to impeach the victim with this prior inconsistent statement that she had a more limited opportunity to view the assailant.

8. Again, petitioner complains that trial counsel failed to impeach the victim concerning this discrepancy.

## FACTUAL BACKGROUND

Testimony at trial, taken from the state court record, is as follows.[6] On direct examination, the victim testified that she awakened in her bed at 8:30 a.m. on May 15, 1986, when she "heard the door squeak." (Tr. 2–19). She had the opportunity to "look right at [the] face" of her unknown assailant who had a knife in his hand. (Tr. 2–19 & 25). The assailant climbed on top of her and, when she began to cry, told her "to be quiet 'or I'll kill you.'"[7] (Tr. 2–19).

The victim further testified that the assailant "touched me on my breasts" and inserted a finger in "my vagina." (Tr. 2–20). The Boston Police Incident Report ("the incident report"), dated May 15, 1986, 10:25 a.m., fails to note a sexual assault.[8] According to a subsequent police report filed by Detective Ingersoll, the victim first mentioned the above sexual assault at "the probable cause hearing in Roxbury District Court."[9] (Docket Entry # 15, Ex. B; Tr. 2–27). The probable cause hearing apparently took place in August 1986, approximately 81 days after the incident.[10]

According to the victim's testimony, the assailant, still armed with a knife, then pinned her to a wall while he looked through the house. She was alone in the house at the time of the incident. Although she did not see an accomplice, she testified that the as-

9. Petitioner points out that trial counsel neither objected nor requested an instruction when the prosecutor referred to petitioner as being present at the probable cause hearing. (Tr. 2–27 & 80–81). Contrary to petitioner's argument, however, because the prosecutor did not refer specifically to petitioner's failure to testify or to offer evidence at the probable cause hearing, section 23 of Massachusetts General Laws chapter 278 is inapposite. Moreover, as noted by the Appeals Court (Docket Entry # 15, Ex. D), the trial judge instructed the jury concerning the criminal process (Tr. 3–39–40).

10. Petitioner repeats his allegation that trial counsel failed to impeach the victim regarding her estimated 81–day delay in reporting the sexual assault.

sailant was not alone and that there were "two of them." (Tr. 2–22 & 40). After searching the house, the assailant left, taking with him a leather coat belonging to the victim.[11] (Tr. 2–21–22).

The victim then testified that she went to the home of her sister-in-law, who lived nearby,[12] and related her story.[13] She telephoned the police who arrived at the scene shortly thereafter and compiled the incident report. (Tr. 2–22–24).

On the afternoon of May 15, 1986, the victim went to the Boston Police Department, District 2, in Roxbury. After viewing an array of 600 to 700 photographs, she identified petitioner as the assailant. Detective Ingersoll conducted the photographic array. Before viewing the photographs, the victim described the assailant as "about five eleven, and he had dreadlocks, braided, with a hat." (Tr. 2–26, 31, 33, 46 & 49). The incident report fails to mention the assailant as having a dreadlocks hairstyle. Nor did trial counsel question the victim about this discrepancy.[14]

In identifying the assailant from the photographic array, *trial counsel* elicited from the victim that she could never forget the face of her assailant and, after viewing a photograph of petitioner for half a second, told the jury that "I just knew right after I seen his picture. I knew that that was him." (Tr. 2–35; *see also*, Tr. 2–42, 1. 13–15). At several points during cross examination, trial counsel advised the victim to relax. (Tr. 2–33 & 39). Trial counsel completed his cross examination without exploring her prior inconsistent statements or pointing out other discrepancies contained in her testimony.[15] The prosecutor then rested the Commonwealth's case.

At a bench conference immediately thereafter, trial counsel stated that petitioner was "more than vociferous" in urging trial counsel to recall the victim concerning discrepancies in her testimony. Disagreeing with his client, trial counsel opted for a different "strategy," explaining to the trial judge that it was "a disadvantage when you try to cross examine young ladies because the fact that she's highly emotional." (Tr. 2–62).

When petitioner took the stand, he denied ever being in the victim's house or bedroom on May 15, 1986. (Tr. 2–71). He testified that he regularly worked at Crossing Autobody Shop ("the shop") in Roxbury. Petitioner further testified that from April through July 1986 he refurbished a 1980 Lincoln automobile at the shop with a friend, Christopher Cross. Petitioner also testified that he regularly opened the shop every day at 7:30 a.m. (Tr. 2–64–69 & 84). At the time of trial, however, he could not specifically recall where he was at 8:30 a.m. on May 15,

11. Petitioner complains that trial counsel failed to impeach the victim with her contrary statement before the grand jury. When asked during grand jury proceedings whether the assailant took her coat with him, she replied *"I don't really know,* but he must have took it because I couldn't find it; I looked for it; I asked my sister if she let someone use it; she said, no."* (Docket Entry # 15, Ex. C, p. 8). (Emphasis Added). In fact, trial counsel made no attempt to impeach the victim on this issue.

12. The Boston Police Incident Report (Docket Entry # 15, Ex. A) notes the victim's address as 275 Norfolk Avenue and the address of the interview as 273 Norfolk Avenue.

13. Petitioner contends that trial counsel again neglected to impeach the victim with her failure to mention the sexual assault to her sister-in-law.

14. Again, petitioner claims that trial counsel failed to effectively cross examine the victim by asking her why she neglected to mention the assailant's dreadlocks hairstyle initially to the police who arrived at the scene of the incident.

15. The record does reflect that trial counsel asked the victim if she told Detective Ingersoll about the sexual assault. When the victim answered "no" but that she told the police and "[i]t's right in the report", trial counsel failed to challenge her statements. (Tr. 2–37).

1986. (Tr. 2–66). Trial counsel conducted a relatively brief direct examination.

Petitioner's close friend, John Wornum, who presently resides in Georgia, was a "part-owner" of the shop in July of 1988. (Docket Entry #15, Ex. H). He was in Georgia at the time of trial and, according to his July 1988 affidavit, agreed to testify on petitioner's behalf. Trial counsel failed to notify him of petitioner's trial. He avers that, had he known of petitioner's trial, he would have testified that petitioner regularly worked at his shop in May of 1986 and that on "a Thursday" petitioner "would have been working in . . . the shop." [16] (Docket Entry #15, Ex. H).

On cross examination of petitioner, the prosecutor pointed out that neither John Wornum, Rufus Wornum, who ran the shop in John Wornum's absence, nor Christopher Cross, were in the courtroom to verify petitioner's story of being at the shop at 8:30 a.m. on May 15, 1986. (Tr. 2–88). Petitioner explained that John Wornum was in Georgia, Rufus Wornum was "running the shop" and Christopher Cross was in the marines. (Tr. 2–88). The prosecutor emphasized these "missing witnesses" in closing argument. (Tr. 3–31).

After examination of petitioner, trial counsel rested his case. (Tr. 2–92). Trial counsel did not produce any character witnesses. Nor did trial counsel move for a continuance at the outset of trial in order to secure the testimony of petitioner's alibi witness, John Wornum.[17]

Trial counsel's closing argument focused on recapitulating the events of May 15, 1986, and the trial testimony. As posited by trial counsel, the jury had to decide whether the victim was telling the truth. (Tr. 3–7). Rather than focusing on the victim's credibility or her identifications of petitioner, trial counsel cautioned the jury to consider Detective Ingersoll's conduct and the circum-

stances of petitioner's arrest 13 days after the photographic identification in the context of the phrase "fair play." (Tr. 3–8–12 & 14–15). He surmised that, had the arrest taken place immediately after the photographic identification, petitioner could have readily corroborated his whereabouts at 8:30 a.m. on May 15, 1986. Trial counsel then stated the following:

> I suggest *you could side with [the victim].* Difficult job for myself to cross examine a young girl in a case like this, because I could put one of my family in that position, anyone.
>
> The main thing is that gentlemen have a tough time trying to probe into intimate matters with females. The fact is that this fourteen year olders (sic) was at the brink of breaking up and getting hysterical.

(Tr. 3–12). (Emphasis Added).

Trial counsel further argued that the victim was hysterical at the time she identified petitioner's photograph and essentially chose the first photograph she viewed of a male with a dreadlocks hairstyle. At this point, the trial judge, upon objection, interrupted trial counsel's argument to advise the jury they were to consider only their recollection of the evidence.

Trial counsel then argued that petitioner was telling the truth because, in lieu of testifying that he knew he was at the garage on May 15, 1986, petitioner stated he "usually" worked at the garage. He then committed what petitioner now argues were additional and rather grievous errors, i.e., he again sided with the victim and, referring to the photographic identification procedure, opined there was nothing wrong. In fact, he reiterated, without qualification, the victim's positive identification of petitioner. Trial counsel argued as follows:[18]

> All the evidence that you heard was a fourteen year old girl. Believe me, a fourteen year old girl has all the rights of everybody. If something happened to

---

**16.** Petitioner argues that trial counsel's failure to contact his only alibi witness in order to corroborate his story constitutes ineffective assistance of counsel.

**17.** Again, petitioner characterizes trial counsel's failure to move for a continuance as ineffective assistance of counsel.

**18.** For context, this court reproduces the entire quotation.

her—fortunately she's made a pretty good recovery because *she testified as a forthright young lady.* She's going to school. She wasn't going to school though the day that this incident is alleged to take place. She said she overslept. She was home alone.

But she picked out a picture, and that picture has lived with [petitioner] since late May of '86. A picture is worth a thousand words, you've heard.

Well, you heard Detective Ingersoll say, 'She looked at 6, 700 pictures. etc., and she was by herself, and then she picked out the picture.'

Everything regarding how the picture was picked out I suggest *was done according Hoyle.* There was no prompting or anything. Detective Ingersoll, an experienced police officer for many years over in the Roxbury District.

He testified that he just wanted her to pick out something. As a matter of fact, he asked her after she picked out [petitioner's] picture, 'Do you want to go a little further?' She said, '*No, no, that's the one. I'm definitely sure,*' with the dreadlocks.

I suggest that the dreadlocks are why [petitioner] is here.

(Tr. 3–18–19). (Emphasis Added).

Trial counsel then characterized the victim as an hysterical young girl and pointed out that she did not immediately describe the sexual assault to her sister-in-law or to the police.[19] He then returned to the argument that petitioner's arrest occurred approximately 13 days after the May 15, 1986, incident, thereby eroding his ability to remember his specific actions on May 15, 1986. He argued that petitioner was telling the truth and, despite the stigma of his dreadlocks hairstyle, continues to wear his hair in this style. (Tr. 2–20–25).

As pointed out by the prosecution in closing argument, petitioner did not produce several "missing witnesses", in particular, John Wornum, Rufus Wornum and Christopher Cross. (Tr. 3–31). He argued, without objection, that "Brenda Barbosa came to this court to seek justice, and you can give her justice. She is the victim." Nor did trial counsel object to the prosecution's incorrect summary of the victim's initial description of petitioner to the police as a "Black man, medium build, medium complexion, dreadlocks, the kind of hair that is customarily worn by people who come from Trinidad or Jamaica. Pretty accurate description." [20] (Tr. 3–28).

Turning to the jury charge, it did not include an instruction that a victim may be honestly mistaken in the identification of her assailant in accordance with *Commonwealth v. Rodriguez,* 378 Mass. 296, 302, 391 N.E.2d 889 (1979). Nor did trial counsel request such an instruction (Tr. 3–49), although the trial judge anticipated he might give a *Rodriguez* instruction to the jury should they have a question (Tr. 3–52 & 55).[21] The trial judge did, however, caution the jury "to consider whether the party had the opportunity to make the observation." (Tr. 3–37).

### DISCUSSION

The Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) established a two prong standard in evaluating ineffective assistance of counsel claims under the Sixth Amendment. First, petitioner must show that trial " 'counsel's performance was deficient' and 'the deficient performance prejudiced the defense.' " *Bryant v. Vose,* 785 F.2d 364, 369 (1st Cir.), *cert. den.,* 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986) (quoting *Strickland*). A deficient performance is one that falls below "an objective standard of reasonableness" under prevailing professional

---

19. As noted by respondent, trial counsel also managed to elicit from Detective Ingersoll that petitioner's photograph "could have been" the first photograph viewed by the victim depicting a male with a dreadlocks hairstyle. (Tr. 2–55).

20. Detective Ingersoll characterized the incident report as providing only a "vague description" of the assailant. (Tr. 2–49).

21. Petitioner argues that trial counsel's failure to request such an instruction provides one more example of his ineffective performance. The trial judge also intimated, *albeit* in an oblique manner, that trial counsel was not treating his case with an appropriate degree of seriousness. (Tr. 3–53).

norms when considering all the circumstances. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064; *Clark v. Moran,* 749 F.Supp. 1186, 1199 (D.R.I.1990), *affm'd,* 942 F.2d 24 (1st Cir.1991).

It is important to emphasize that petitioner bears a "heavy burden." *Whitman v. Ventetuolo,* 781 F.Supp. 95, 99 (D.R.I.1991). There is a presumption that trial "counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Pilchak v. Camper,* 741 F.Supp. 782, 792 (W.D.Mo. 1990), *affm'd,* 935 F.2d 145 (8th Cir.1991) (quoting *Strickland*). This court must make "*every* effort ... to eliminate the distorting effects of hindsight." *Clark v. Moran,* 749 F.Supp. at 1199–1200 (quoting *Strickland;* emphasis added).

Under the second prong, it is the burden of petitioner to show there is a "reasonable possibility that, but for counsel's unprofessional errors, the result ... would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 1201; *accord Patterson v. Dahm,* 769 F.Supp. 1103, 1107–1108 (D.Neb.1991). Moreover, not "'every error that conceivably could have influenced the outcome undermines the reliability of the proceeding.'" *Virella v. United States,* 750 F.Supp. 111, 117 (S.D.N.Y.1990).

An ineffective assistance of counsel claim presents a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. Thus, this court is not bound by the conclusion(s) of the state court(s) that counsel rendered effective assistance. *Anderson v. Butler,* 858 F.2d 16, 18 (1st Cir.1988). Succinctly explained, "the presumption of correctness accorded the factual determinations of the state court ... applies to the historical facts underlying the attorney's performance but not the ultimate conclusion as to whether or not effective assistance has been rendered." *Patterson v. Dahm,* 769 F.Supp. at 1108 (quoting *Kellogg v. Scurr,* 741 F.2d 1099, 1101 (8th Cir.1984)); *see Clozza v. Murray,* 913 F.2d 1092, 1100 (4th Cir.1990), *cert. den.,* 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991) (discussing § 2254(d)); *see also Clark v. Moran,* 749 F.Supp. at 1191 (state court's findings on ineffective assistance of counsel are not binding on federal court).

With the exception of the probable cause hearing, the facts underlying petitioner's claim are reliably determined from the record and capable of accurate reconstruction. *See generally, Perron v. Perrin,* 742 F.2d 669, 672 (1st Cir.1984) (noting that ineffective assistance of counsel claim could be reconstructed from the record and that evidentiary hearing was therefore unnecessary; nor, apparently, did parties request an evidentiary hearing). Nevertheless, out of an abundance of caution this court set an evidentiary hearing. Despite the notice of an evidentiary hearing sent to both parties, neither respondent nor petitioner chose to present additional evidence at the January 15, 1993, hearing.

This court now examines the specific claims which make up petitioner's ineffective assistance of counsel claim.

### A. *Trial Counsel's Failure to Impeach The Victim*

Petitioner claims that trial counsel failed to impeach the victim with her prior inconsistent statements and descriptions of the May 15, 1986, incident. Specifically, trial counsel completely failed to question the victim about why she neglected to mention her assailant's dreadlocks hairstyle to the police when they first arrived at 273 Norfolk Avenue on the morning of May 15, 1986. The incident report does not mention a dreadlocks hairstyle.

In closing argument, trial counsel focused on the fact that petitioner had not altered his hairstyle since the May 15, 1986, incident despite the stigma attached to his hairstyle. This argument misses the mark. Petitioner's hairstyle is a particularly salient physical feature of his appearance. Trial counsel never asked the victim why she failed to immediately mention this salient feature to the police when they arrived at 273 Norfolk Avenue.

Similarly, trial counsel neglected to adequately question the victim about her delay in relating her story of a sexual assault to the

police.[22] The record reflects she did not mention the sexual assault to her sister-in-law or to Detective Williams before she viewed the photographic array. Nor does the incident report describe a sexual assault. Apparently, it was not until the probable cause hearing that the victim first mentioned the sexual assault. Trial counsel's failure to adequately explore this lengthy lapse of time with the victim on cross examination presents a glaring omission which negatively impacts his entire performance.

Nor does trial counsel's abbreviated and oblique reference to this lengthy delay in closing argument cure his error. In closing argument, trial counsel stated that the victim did not tell anyone she had a "physical disability" on the day of the incident and he questioned whether the sexual assault ever "really happened." (Tr. 3–17, 1. 14–18; Tr. 3–20, 1. 15–20). Trial counsel did not, however, develop this argument for the jury.

In addition, trial counsel failed to question the victim about the variance in her statements regarding: (1) whether the assailant took her leather coat; and (2) her opportunity to view the assailant when he entered her room.[23] The above errors collectively provide strong evidence of unreasonable and unprofessional judgment.

Respondent nevertheless correctly points out that ineffective trial strategy is not the equivalent of ineffective assistance of trial counsel. *Patterson v. Dahm,* 769 F.Supp. at 1110; *see also Rankin v. Roberts,* 788 F.Supp. 521, 524 (D.Kan.1992) (counsel's failure to spend time with client, to cross examine witnesses and to make effective opening and closing arguments of appropriate length deemed matter of trial strategy). It is also petitioner's burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted).

The Appeals Court stated that trial counsel's:

strategy, expressed at the bench (Tr. II 61–62), was reasonable in the circumstances. He developed inconsistencies in the victim's story through cross examination of the victim (Tr. II 36–37) ... but chose not to undermine his defense strategy by suggesting that she had previously failed to mention the defendant's dreadlocks. It also was a reasonable decision on his part not to appear to be badgering or harassing an already upset victim in front of the jury.[24]

(Docket Entry # 15, Ex. D). As noted by petitioner (Docket Entry # 15, pp. 16–17), the cross examination cited above by the Appeals Court (Tr. 2–36–37, 1. 12–13) actually demonstrates that trial counsel failed to impeach the victim.[25] Furthermore, if trial counsel's strategy was not to badger the victim in front of the jury, why then did trial counsel simply avoid a detailed cross exami-

---

**22.** Although trial counsel asked the victim if she told Detective Ingersoll about the sexual assault, he left unchallenged her statements that she initially told the police about the sexual assault and that it was in the incident report. (Tr. 2–37).

**23.** In addition, petitioner asserts, on information and belief, that the victim's testimony at the probable cause hearing contains a number of statements inconsistent with her trial testimony and that trial counsel neglected to impeach the victim with these prior inconsistent statements. (Docket Entry # 15, p. 23). Tapes of the probable cause hearing are, however, apparently unavailable. Nor did petitioner produce an affidavit depicting the particular statements. Consequently, as discussed *infra,* this argument is unavailing.

**24.** The Appeals Court additionally stated that trial counsel's strategy was to "stress the point that

the victim identified the defendant solely because he had dreadlocks, as did her assailant." (Docket Entry # 15, Ex. D).

**25.** During cross examination, trial counsel elicited the statement from the victim that she told the police about the sexual assault when the incident first happened. Trial counsel neglected at this point to impeach the victim with the incident report which directly contradicts her trial testimony. Testimony is as follows:

Q. But you didn't tell [Detective Ingersoll] about the fact that this man touched your private parts?
A. No, but I told the other cops when they came.
Q. When?
A. When it first happened, the cops that came over to the house. It's right in the report.
(Tr. 2–37).

nation of the victim and offer into evidence the incident report?[26] Trial counsel's disregard of vital impeachment evidence in a case where the primary evidence consists of the victim's word against that of petitioner is both misguided and lacking in professional judgment.

A review of the historical facts demonstrates to this court that trial counsel's hesitancy to cross examine the victim was not based on trial strategy. Rather, trial counsel's "strategy" in not cross examining the victim appears based on his personal discomfort in cross examining a female about a sexual assault.[27] While understandable, a man's liberty was at stake and the victim's failure to mention the sexual assault until August of 1986 constituted a critical discrepancy in her story as did her failure to initially mention the dreadlocks hairstyle of the assailant to the police.

Turning to the prejudice component of the *Strickland* test, the victim's credibility was not a minor matter. Both the accuracy and consistency of the victim's identifications of petitioner were significant matters, particularly in light of the limited number of witnesses and evidence presented. *See Nealy v. Cabana*, 764 F.2d 1173, 1179 (5th Cir.1985). Trial counsel himself characterized this as "primarily an identity type of case." (Tr. 2–61). Nevertheless, trial counsel failed to call into question the victim's credibility by adequately exploring her delay in reporting the sexual assault; her description of the assailant's dreadlocks hairstyle; her description of being awake when the assailant entered her room; and her assertion that the assailant took her leather coat. Rather, trial counsel conducted an extremely limited cross examination of the victim which, despite the shortness in length, managed to elicit additional confirmatory statements regarding her identification of petitioner's ·photograph.

## B. *Trial Counsel's Closing Argument*

Petitioner maintains that trial counsel's closing argument was inadequate and misdirected. Despite petitioner's heavy burden, this court concurs.

At the outset of his closing argument, trial counsel focused on whether petitioner received "fair play" because of the delay in his arrest and the circumstances surrounding his arrest. (Tr. 3–8–12 & 14–15). This initial focus ignores the critical evidence concerning the victim's credibility and the strength of her identifications.

Instead, trial counsel attempted to cloth the victim as an emotionally distraught girl who, in order to feel vindicated, chose the first photograph she viewed depicting an individual with a dreadlocks hairstyle.[28] Not mentioning the ·victim's failure to initially describe the assailant as having a dreadlocks hairstyle arguably fits within this "strategy," as noted by the Appeals Court. What does not fit within this strategy, however, is trial counsel's failure to emphasize the victim's delay in reporting the sexual assault[29] and his failure to explore the victim's inconsistent descriptions concerning the leather coat and her opportunity to view the assailant. More-

---

26. This court is somewhat limited by the record. In particular, this court lacks a copy of the state court exhibit list. A review of the trial transcripts shows no reference to the admission of the incident report as an exhibit. In the event this court is incorrect in its assumption, either party is invited to come forth with additional evidence regarding admission of the incident report within ten days of receipt of this Order.

27. Trial counsel stated to the trial judge that, "It's a disadvantage when you try to examine young ladies because of the fact that she's highly emotional." (Tr. 2–62). Similarly, to the jury during closing argument, he stated that:

> Difficult job for myself to cross-examine a young girl in a case like this, because I could put one of my family in that position, anyone

... The main thing is that gentlemen have a tough time trying to probe into intimate matters with females. The fact is that this fourteen year olders (sic) was at the brink of breaking up and getting hysterical.
(Tr. 3–12).

28. Trial counsel also noted gaps in the testimony but failed to identify the specific gaps for the jury. (Tr. 3–20). Nor does the record reflect that the jury had the incident report to view the discrepancies.

29. As previously noted, trial counsel's reference to the victim's delay in voicing the sexual assault was brief and, without developing this argument, he summarily proceeded to discuss the fairness and delay surrounding petitioner's arrest. (Tr. 3–20–23).

over, if the victim was emotionally distraught and hysterical, why did trial counsel simultaneously describe her as a forthright witness?

Not only was trial counsel's "strategy" misplaced but it ignored the strenuous urging of his client to identify the discrepancies contained in the victim's testimony (Tr. 2–61). Consequently, although it is petitioner's burden to overcome the presumption that trial counsel's action might be sound trial strategy, *United States v. Simone*, 931 F.2d 1186, 1197 (7th Cir.), *cert. den.*, 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991) (trial counsel's closing argument in following strategy did not fall below objective standard of reasonableness), when placed in the context of the entire closing argument, trial counsel's strategy was misguided, at best.

When discussing the victim, he suggested to the jury that they "could side with [the victim]" and that she was "forthright." These comments, viewed in the context of the particular quotation and of the entire argument, show a significant lack of professional judgment and reduced the effectiveness of trial counsel's "strategy" of depicting the victim as a highly emotional young woman who chose the first photograph she viewed containing a dreadlocks hairstyle. In discussing the photographic identification, trial counsel reiterated the victim's positive and unequivocal identification of petitioner as the assailant as well as the correctness of the procedure.

Nor can the above errors be viewed as innocent in their effect upon the jury. Had trial counsel marshalled the victim's incompatible descriptions for the jury in his closing argument, there is a reasonable probability that the result would have been different.

### C. *Failure to Produce Alibi Witness*

Petitioner claims that trial counsel failed to summons his only alibi witness or move for a continuance in order to secure the witness' attendance at trial. Petitioner learned his case was set for trial on or about May 12, 1986, the day before trial commenced. (Tr. 2–66). He avers he informed trial counsel that John Wornum would testify on his be-

half. (Docket Entry # 15, Ex. G). John Wornum avers that he would have testified that petitioner regularly worked at his shop in May 1986 and that at 8:30 a.m. on a Thursday morning, petitioner "would have been working in the yard or in the shop." (Docket Entry # 15, Ex. H). John Wornum additionally avers that trial counsel never contacted him to testify despite his understanding that trial counsel would contact him at the appropriate time. (*Id.*).

The Appeals Court concluded, *albeit* not in the context of an ineffective assistance of counsel claim, that trial counsel's failure to call John Wornum as a witness would not have deprived petitioner of a substantial defense. (Docket Entry # 15, Ex. D). This court respectfully disagrees with this conclusion. The Appeals Court also noted that John Wornum's affidavit failed to state that he had a specific memory of May 15, 1986, or documentary evidence to support his contentions. (Id.). While this court accepts this factual finding regarding the content of the affidavit, the affidavit cannot be so easily discounted. Rather, the affidavit provides strong evidence that John Wornum would have corroborated petitioner's defense that he was not at the scene of the crime.

One of petitioner's principal defenses was that he was not in the victim's bedroom at 8:30 a.m. on May 15, 1986. He consistently claimed he was at work although he had no specific memory of his actions on May 15, 1986. John Wornum's testimony was vital to this defense. The prosecutor repeatedly noted his absence for the jury. (Tr. 2–88 & 3–31).

Trial counsel's unexplained failure to contact John Wornum or to move for a continuance in order to secure his testimony was deficient and, under the circumstances, prejudicial. Although presumably pressed for time because of the short trial notice, trial counsel could have moved for a continuance. There is also no evidence that trial counsel made *any* attempt to contact John Wornum in advance or during petitioner's trial. Such

actions left the jury with little evidence to support petitioner's self serving testimony.

In a case decided before *Strickland* but nevertheless opposite to the case at bar, the court found that counsel was ineffective in failing to call an alibi witness when the entire case consisted of the personal identification of defendant by two victims of the armed robbery. *Wilson v. Cowan,* 578 F.2d 166, 168 (6th Cir.1978).[30] Although the jury had the benefit of petitioner's testimony, trial counsel's failure to call John Wornum to the witness stand nevertheless deprived the jury of a valuable opportunity to hear crucial evidence. *See Id.* at 168. This is particularly true in light of the limited nature of the evidence presented, including the lack of exhibits offered by trial counsel into the record and the lack of character witnesses to testify on petitioner's behalf and the jury's awareness of the absence of "missing witnesses".

### D. *Trial Preparation and Overall Performance*

Petitioner next argues that trial counsel's preparation and performance at trial fell below an objective standard of reasonableness. Under the circumstances, trial counsel had little time to prepare for trial. This does not, however, excuse trial counsel's apparent failure to review the transcripts of the probable cause hearing or his failure throughout the

direct examination of the victim to object to the prosecutor's leading questions.

Turning to the latter, failure to object at trial to leading questions is generally considered a tactical decision. *Pilchak v. Camper,* 741 F.Supp. 782, 793 (W.D.Mo.1990). In this case, the direct examination of the victim presents a series of leading questions without objection.[31] (Tr. 2–19–22). Standing alone, this court might presume that trial counsel chose not to alienate the jury with repeated interruptions. In the context of trial counsel's other errors, however, his failure to object is more troubling.

Petitioner also complains that trial counsel failed to object to the prosecutor's mischaracterization of the evidence in closing argument. Interruptions during closing argument are often avoided as a matter of professional courtesy, although the prosecutor showed no such professional courtesy. This court, however, does not place particular emphasis on trial counsel's failure to object to the prosecutor's misstatements of fact in closing argument inasmuch as the trial judge repeatedly instructed the jury that it was their recollection of the evidence which was controlling. (Tr. 3–9–10, 13–14 & 36–37).

Turning to the failure to obtain transcripts of the probable cause hearing, this court is somewhat limited by the record.[32] Although such a failure would evidence inadequate preparation, there is no showing of prejudice

---

**30.** *Cf. Anderson v. Butler,* 858 F.2d 16 (1st Cir. 1988) (trial counsel's promise to produce expert witness in opening statement and subsequent failure to call witness was ineffective and prejudicial as a matter of law). The First Circuit, however, noted they "might have no quarrel with counsel's" failure to call the expert witness "had that matter stood alone" without the reference during counsel's opening statement. *Id.* at 18.

**31.** Direct examination proceeded as follows:

Q. Now, I'm going to further direct your attention to about 8:30 in the morning. You were in bed asleep at that time, weren't you?
A. Yes, sir.
Q. Were you awakened by something?
A. Yes.
Q. Okay. Would you tell us what that was?
A. A man.
Q. A man came into your bedroom?

A. Yes.
Q. What did this man do?
A. He came in my room, and I heard the door squeak. When I looked up, I seen him. He had a knife in his hand.
Q. This was daylight, wasn't it?
A. Yes.
Q. So, you had the opportunity to look right at his face, didn't you?
A. Yes. . . .
(Tr. 2–18–19).

**32.** Respondent did not produce an affidavit to the effect that trial counsel obtained and read the transcripts of the probable cause hearing. Neither respondent nor petitioner produced any witnesses at the January 15, 1993, hearing. Petitioner avers that the only opportunity he had to explain his case to trial counsel was a 15 minute conversation shortly before jury selection. (Docket Entry # 15, Ex. G).

given the absence of adequate proof as to the testimony at the hearing.

In closing, this court has given a great deal of thought and perpension to trial counsel's actions and inactions. It is the culmination of errors taken as a whole which, under the circumstances, establishes trial counsel's ineffective assistance in this case. In short, trial counsel failed to impeach the victim in a case where the jury obviously based its verdict on the victim's story. Trial counsel failed to marshal the facts during a rather disjointed closing argument which focused in large part on the fairness of petitioner's arrest. Finally, trial counsel failed to secure the testimony of petitioner's only alibi witness, John Wornum. While counsel has no obligation to render a sterling performance, counsel does have an obligation to render a reasonable performance under prevailing professional norms. Based on the foregoing reasons, this court finds that petitioner has shown that trial counsel's performance fell below an objective standard of reasonableness.

### E. *Prejudice*

Such ineffective assistance on the part of trial counsel was also highly prejudicial. This case consisted primarily of the victim's testimony against that of petitioner. Without producing petitioner's alibi witness nor any character witnesses, trial counsel left petitioner to present his own version of the facts to the jury without collateral support. Nor did trial counsel fully attempt to discredit the victim's testimony with her prior inconsistent statements or her delay in reporting the sexual assault. There is no indication in the trial record that trial counsel offered into evidence the incident report or the subsequent police report, so that the jury could compare the discrepancies between the vic-

tim's prior descriptions and her subsequent testimony in court.

To state the obvious, there were no witnesses to the May 15, 1986, incident other than the victim and the assailant. Impeachment evidence therefore becomes all the more vital. The jury is entitled to consider this evidence. It is also entitled to consider the testimony of petitioner's only alibi witness. The Sixth Amendment demands no less. Had the jury considered this evidence, heard the testimony of John Wornum and heard an effective closing argument marshaling these discrepancies, there is a strong possibility that, but for trial counsel's errors in neglecting to present this evidence, the result of petitioner's trial would have been different. These cumulative errors taken as a whole are sufficient to undermine this court's confidence in the jury verdict.

### CONCLUSION

It is therefore **RECOMMENDED** [33] that the writ of habeas corpus be **ALLOWED** unless respondent, on behalf of the Commonwealth, promptly elects to grant petitioner a new trial.

Stephen Hrones and Murray Kuhn for the petitioner.

Linda Nutting Murphy for the defendant.

---

**33.** *See* Rule 8(b)(3) of the Rules Governing Section 2254 Cases in the United States District Courts. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may

respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).