**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0770n.06**
**Filed: November 1, 2007**

**No. 06-1399**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DANIEL LEE WOLFE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BARBARA BOCK, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: BOGGS, Chief Judge; MARTIN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. A jury convicted Daniel Wolfe of first-degree felony murder and possession of a firearm during the commission of a felony. The state court denied Wolfe's ineffective-assistance, *Brady* and pre-indictment-delay claims. Because the state-court decisions were neither contrary to, nor an unreasonable application of, Supreme Court precedent, we affirm the district court's denial of Wolfe's habeas petition.

I.

Donald Reynolds owned the Silver Rail Bar, where he tended bar and regularly cashed paychecks for employees of nearby businesses. Each night, at closing time, Reynolds counted the day's take, set aside money for the next day's business and put all of the change in a tackle box.

In the early morning hours of September 4, 1980, officers found Reynolds dead from an apparent shooting in the parking lot of the Silver Rail Bar. Investigators identified possible leads, including Daniel Wolfe. Wolfe worked at the nearby Michigan Seat Company and frequently cashed his paychecks at the Silver Rail Bar. Officer Jerry Boyer interviewed Wolfe twice in 1981 and conducted follow-up investigations over the following years.

In December 1994, Detective Cliff Edwards spoke for the first time to Gary Raab about the incident, and Raab disclaimed knowing anything about the crime. In June 1995, Detective Edwards again met with Raab, told him that he had evidence against Wolfe and Greg Derbyshire, as well as evidence that Raab was involved in the crime, and offered Raab immunity in exchange for his testimony. Raab vaguely described having driven around with Wolfe and Derbyshire that night but insisted that "[he] told [Edwards] everything that [he] possibly kn[e]w." JA 166. In August 1995, officers arrested Wolfe. In September, Raab provided details about the offense in a third statement, which he signed after obtaining a grant of immunity.

The State tried Wolfe and Derbyshire together for the murder but before separate juries. Consistent with his third statement, Raab gave a detailed account of the murder. He acknowledged that he originally told Detective Edwards that he could not recall many of the events of the evening and explained that, after talking with Edwards, he spent "a lot of nights" thinking about the evening and having "flashes" about it. JA 559. He testified that he and Joe Griehs rode in the back seat of a car driven by Derbyshire on the evening of September 3, and Wolfe rode in the front passenger seat. While the four of them drove around town that night (and smoked marijuana), Raab overheard

Derbyshire and Wolfe talk about stealing money. Derbyshire drove to the Silver Rail Bar, where he and Wolfe said that they planned to jump off the roof of the bar and steal a man's money. Derbyshire and Wolfe got out of the car, returned after some time, continued driving around and then went back to the bar. Raab testified that, while he was in the back seat of the car, he "heard a noise," "started looking out the window," saw a brief flash of light and heard two gun shots. JA 538–39. He saw three individuals—Wolfe, Derbyshire and an older man. Wolfe and Derbyshire returned to the car, after which Wolfe repeatedly said, "Why, [Derbyshire], why?" JA 539. They all drove to a field, where Wolfe and Derbyshire took off some of their clothes; at that point, Raab saw a gun in Derbyshire's hand. They went to Donna Kilgore's house after that. Raab went home, heard about the incident the next day, returned to Kilgore's house and saw "a bunch of change laying on a cushion" and a box with checks in it. JA 546.

A jury found Wolfe guilty of first-degree felony murder of Reynolds, possession of a firearm during the commission of a felony and armed robbery. A jury also convicted Derbyshire on all three counts. The court vacated Wolfe's armed-robbery conviction and sentenced him to life imprisonment without parole for the first-degree murder conviction and to a consecutive two-year term for the felony-firearm conviction.

In October 1997, the Michigan Court of Appeals granted Wolfe's motion to remand for a hearing on newly discovered evidence: a tape of Raab's second interview with the police and the fact that Raab was an inmate at the time of the murder. After the evidentiary hearing, the trial court

denied Wolfe's motion for a new trial. The Michigan Court of Appeals affirmed his convictions and the Michigan Supreme Court denied leave to appeal.

In 2006, the district court denied Wolfe's petition for a writ of habeas corpus. It granted a certificate of appealability on three claims: (1) the failure of the prosecution to disclose the recorded interview with Gary Raab; (2) ineffective assistance of counsel; and (3) the denial of a fair trial due to the 15-year delay between the murder and the indictment.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant Wolfe's petition if the state-court rulings were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

A.

To obtain relief under *Brady v. Maryland*, 373 U.S. 83 (1963), Wolfe must show: (1) that the evidence at issue was favorable to him; (2) that the prosecution suppressed that evidence; and (3) that he suffered prejudice from the non-disclosure, which is to say, there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted). *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The prosecution violated *Brady*, Wolfe argues, when it failed to disclose Raab's second statement to Detective Edwards in June 1995, in which Raab gave a vague description of the events of the night and explicitly denied having any additional knowledge. *See* JA 166 ("Why I, I, told you everything that I possibly know."). Wolfe argues that he could have used this evidence to impeach Raab when he later testified in detail about the night of the murder.

Even if Wolfe could satisfy the first two requirements of a *Brady* claim (which we need not decide), he cannot establish the requisite prejudice because his counsel impeached Raab at trial on the basis of similar evidence. At trial, Wolfe knew about an initial statement Raab gave to police in December 1994, in which he claimed he knew nothing about the murder. Defense counsel thoroughly impeached Raab multiple times on this point. *See* JA 552 (Derbyshire's Counsel: "Mr. Raab, when you originally spoke with Detective Edwards regarding this matter, you told him that you couldn't recall anything that occurred. Is that correct?" Raab: "Yes, I did. I was too scared to say anything." Counsel: "And essentially you're testifying here under what's called a grant of immunity. Is that correct?" Raab: "Yes, it is."); JA 555 (Wolfe's Counsel: "Prior to you being able to get to any kind of immunity . . . you denied any knowledge at all. Is that correct?" Raab: "Yes." Counsel: "You lied, right?" Raab: "I was scared."); JA 559–60 (Wolfe's Counsel: "When you spoke to Detective Edwards the first time, you also didn't recall a lot of whatever took place. Is that correct?" Raab: "Yes." Counsel: "And you had to stay up at night sometimes, and you would think about it a whole, whole lot before you went to sleep and then have flashes of things. Is that right?"

Raab: "Yes, I did." Counsel: "[Y]ou needed to have a version of events that was acceptable to the Prosecution, didn't you?").

Given the similarity between the first and second statements (that Raab knew nothing about the murder), given Wolfe's ability to impeach Raab about the difference between his first statement and his detailed recollections in the third statement and given the similarity in impeachment value of the first and second statements (they both suggested that Raab could recall the events of the evening only when he had an immunity incentive to so), Wolfe cannot show that his trial would have come out differently had he been in possession of two initial statements of ignorance rather than just one. The Michigan Court of Appeals reasonably determined that Wolfe failed to demonstrate a "reasonable probability" that the result of his trial would have been different if the prosecution had turned over the second statement. *People v. Wolfe*, No. 193139, at 7 (Mich. Ct. App. Feb. 12, 1999) (quoting *Kyles*, 514 U.S. at 433).

Wolfe separately argues that "the fact that Gary Raab was under sentence at the time of [the crime] should have been disclosed to the defense" because he was in a residence-home program with strict curfews and regular drug testing, which would have precluded Raab from witnessing the murder. Br. at 24–25. As the Michigan Court of Appeals correctly pointed out, however, the prosecution did not suppress Raab's status as an inmate. *See Wolfe*, No. 193139, at 7. The prosecutor provided Wolfe with a record of Raab's criminal history, which indicated that Raab was convicted of burglary on April 11, 1979, and sentenced to one-and-one-half years to fifteen years. As Wolfe's counsel admitted at the post-trial hearing, the period of that sentence covered the night

of the murder. The defense, in short, possessed the relevant information, and as a result the state courts reasonably determined that no *Brady* violation occurred. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) ("[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source."); *see also United States v. Lee*, 188 F. App'x 425, 427 (6th Cir. July 25, 2006) ("Evidence known (or even knowable) to the defendant does not constitute suppressed evidence under Brady.").

Even if the prosecution had suppressed this information, it was not strongly impeaching evidence. Rules were enforced only modestly at the residence-home program, and it was "certainly possible that people [could] violate the rules and get away with it." JA 705. Wolfe's status as an inmate does not create a reasonable probability of a different outcome.

B.

To succeed on a claim of ineffective assistance of counsel, Wolfe must show (1) that the performance of his counsel, Sean Carroll, fell "below an objective standard of reasonableness" and (2) that Wolfe suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 688, 695–96 (1984). The prejudice inquiry, like the prejudice inquiry for a *Brady* claim, requires Wolfe to show that there is a "reasonable probability" that, but for Carroll's deficiency, the trial would have come out differently. *Id.* at 694.

The first defect in Carroll's representation, Wolfe claims, was his failure to "independently investigate" Derbyshire's potential alibi defense, Br. at 41—an alibi defense that Derbyshire's attorney, Ivan Brown, allegedly also did not pursue. Derbyshire claimed that, because he worked the second shift on September 3, 1980, he "couldn't have been where the witnesses said he was" on the eve of the offense. JA 643. Brown "[t]horoughly" investigated this alibi and "hounded" Derbyshire's former employer for evidence, but he located only a payroll register indicating that Derbyshire worked 32 hours during the week in question and that many of the other employees worked 40 hours. JA 643. Because the register also indicated that Derbyshire missed one day of work that week, Brown decided not to pursue this alibi defense further. At the post-trial hearing, Brown testified that he did not realize at the time of trial that September 3 fell during the week of Labor Day (September 1)—which could account for the missed time—but that he "probably [would] not" have pursued the defense anyway because the register still suggested that Derbyshire worked fewer hours than other employees. Carroll testified that he relied on Brown's assessment of the alibi defense in deciding not to pursue the theory, though he also did not realize that Labor Day fell during that week.

The Michigan Court of Appeals did not unreasonably apply *Strickland* in holding that Wolfe failed to satisfy the prejudice requirement. The payroll register provided ambiguous support at most for Derbyshire's alibi because the jury might not have believed that Derbyshire missed work on Labor Day, as opposed to September 3, particularly in view of the fact that other employees worked 40 hours that same week. As the district court pointed out, the records showed that Derbyshire

worked during the *week* of the crime, but they "could not have provided an alibi for the *particular night* of the crime." *Wolfe v. Bock*, No. 01-10053-BC, at 28 (E.D. Mich. Jan. 31, 2006) (emphasis added); *see also Matthews v. Rakie*, 54 F.3d 908, 918–19 (1st Cir. 1995) (determining that there was no reasonable probability of a different outcome where counsel did not call defendant's employer as an alibi witness to testify that the defendant generally worked in the mornings because the employer "could *not* provide an alibi for . . . the particular day of the crime").

Wolfe separately argues that Carroll gave ineffective assistance by failing to request the tape of Raab's second statement. But, once again, Wolfe cannot prove prejudice. Carroll thoroughly impeached Raab at trial based on his first statement in which he denied any knowledge of the event and, most importantly, he impeached Raab based on his later incentive to recall "a version of events that was acceptable to the Prosecution" in order to obtain immunity. JA 560. While the second statement may have provided Carroll additional fodder with which to impeach Raab, his failure to obtain a tape of the second statement does not "undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. The state courts thus did not unreasonably apply the prejudice prong of *Strickland*.

## C.

Wolfe next argues that the "15-year hiatus" between the murder and his arrest violated his due-process right to a fair trial, Br. at 48, a claim that turns on "the reasons for the delay as well as the prejudice to the accused," *United States v. Lovasco*, 431 U.S. 783, 790 (1977). Our circuit "has

consistently read *Lovasco* to hold that dismissal for pre-indictment delay is warranted only when the defendant shows [1] substantial prejudice to his right to a fair trial *and* [2] that the delay was an intentional device by the government to gain a tactical advantage." *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (internal quotation marks omitted) (alterations in original); *McKissic v. Birkett*, 200 F. App'x 463, 469–70 (6th Cir. Oct. 5, 2006) (applying this framework in a habeas challenge to a state-court conviction).

The 15-year delay prejudiced him, Wolfe claims, because he had difficulty remembering his whereabouts at the time of the offense and because his memory "went right to the heart of the case." Br. at 49. We need not decide whether Wolfe satisfies the "substantial prejudice" requirement because he has not shown that the government delayed the prosecution for illegitimate reasons. *See Brown*, 959 F.2d at 66 ("A showing of prejudice to the defendant, without more, is not enough to prove a due process violation; rather, there must also be a consideration of the reasons for the delay.") (internal quotation marks omitted). "[I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused," and thus a prosecutor may "refuse[] to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Lovasco*, 431 U.S. at 795. Otherwise, prosecutors would be forced to file premature indictments and in some instances to file indictments that would never have been filed at all.

The prosecutor testified that he did not seek an indictment until 1995, because it was not until then that several witnesses came forward, including Raab, Kilgore and Griehs. Before then, the

police had approached the prosecutor's office four times, and it was only on the fifth time, after these witnesses had come forward, that the prosecutor issued the charges. Once the prosecutor received this new evidence, the trial court determined that the prosecutor "act[ed] expeditiously." JA 309. The Michigan Court of Appeals reasonably applied *Lovasco* when it determined that Wolfe failed to "establish[] that the prosecutor intentionally delayed this case to gain a tactical advantage" and that the prosecutor in this case "appropriately delayed" prosecuting the case until he could establish Wolfe's guilt beyond a reasonable doubt. *Wolfe*, No. 193139, at 2.

III.

For these reasons, we affirm.